



## OFFICE OF THE ATTORNEY GENERAL OF TEXAS
### AUSTIN

C. MANN
GENERAL

Honorable Geo. H. Sheppard
Comptroller of Public Accounts
Austin, Texas

Dear Sir:

Opinion No. O-307
Re: Liability of a corporation
for chain store tax on stores
selling its products under a
"Budget Plan Agreement" con-
tract.

     This is in answer to your inquiry as to whether or not
estone Tire and Rubber Company is liable under the law for a
in store tax on places of business operating under what is called
restone's Budget Plan.

     According to the facts that you gave us Firestone Tire
and Rubber Company is a corporation that manufactures and sells at
wholesale automobile tires and tubes and other automobiles supplies,
and it has an arrangement with some retail tire-stores (known as
dealers) in Texas under which said retail tire stores purchase tires
and tubes and other merchandise from Firestone Tire and Rubber Com-
pany and resell the same at retail to customers; and in addition
to said retail stores (dealers) buying tires, tubes and other
merchandise from Firestone Tire and Rubber Company, said dealers
have entered into and are carrying out a contract designated as
"Firestone Budget Plan Agreement," which reads in part as follows:

     "Whereas, Dealer is purchasing and selling to the
trade Firestone tires, tubes, batteries and auto supplies
and other Firestone products, and desires to have the
benefit of and to employ certain methods of time payment,
merchandising, developed and as improved and recommended
from time to time by Firestone known as Firestone's Bud-
get Plan.

     "Now, therefore, in consideration of dealer purchas-
ing and maintaining a stock of Firestone products for re-
sale by dealer and in consideration of the mutual covenants
hereinafter contained, it is hereby agreed between the
parties hereto as follows:

COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

"Firestone will forthwith make known to and recommend
to dealer it's current plan and method of merchandising
by time payment, known as its Budget Plan and will from
time to time keep dealer advised of improvements therein
developed by Firestone;

"Firestone will likewise select and recommend for hire
by dealer a person trained in salesmanship under such
Budget Plan and competent in Firestone's opinion to con-
duct and manage for dealer sales of Firestone Products
by dealers under such Budget Plan.

"Dealer agrees to adopt and employ the merchandising
methods of such Budget Plan in dealers sale of Fire-
stone products from such dealers stocks and agrees to
hire and take into dealers employ the person so recom-
mended by Firestone and place him in charge of the
installation and operation of such Budget Plan and depart-
ment for dealer in dealer's place of busines . . ."

"This agreement shall become effective on the date hereof
and shall continue in force until canceled or terminated
by either party on 30 days written notice, by registered
mail, registery receipt requested to the other of its
intention to cancel.

"In the event of any violation of the terms of this agree-
ment of either party hereto, the party hot in default may
notify the other in writing and if such default or violation is
not corrected in 5 days after the receipt of said notice,
the party not in default may at its option terminate this
agreement within 10 days after the receipt of said written
notification to the party in default."

The Chain Store Tax law of Texas is House Bill No. 18,
Chapter 400, First Called Session, 44th Legislature, Acts 1935, (now
codified as Article 1111d of Vernon's Annotated Penal Code). It
provides for certain prescribed license fees to be paid on stores,
and reads in part as follows:

"Sec. 2. Any person, agent, receiver, trustee,
firm, corporation, association or copartnership desiring
to operate, maintain, open or establish a store or mer-
cantile establishment in this State shall apply to the
Comptroller of Public Accounts for a license so to do.
. . .

"Sec. 5. Every person, agent, receiver, trustee,
firm, corporation, association or copartnership opening,
establishing, operating or maintaining one or more stores
or mercantile establishments within this State, under
the same general management, or ownership, shall pay the
license fee hereinafter prescribed for the privilege of
opening, establishing, operating or maintaining such stores
or mercantile establishments.". . .

"Sec. 6. The provisions of this Act shall be construed to apply to every person, agent, receiver, trustee, firm, corporation, copartnership or association, either domestic or foregin, which is controlled or held with others by majority stock ownership or ultimately controlled or directed by one management or association of ultimate management.

"Sec. 7. The term 'store' as used in this Act shall be construed to mean and include any store or stores or any mercantile establishment or establishments not specifically exempted within this Act which are owned, operated, maintained, or controlled by the same person, agent, receiver, trustee, firm, corporation, copartnership or association, either domestic or foregin, in which goods, wares or merchandise of any kind are sold, at retail or wholesale."

It is apparent that the answer to the question involved terein depends on whether or not Firestone Tire and Rubber Company "controls" the stores in question. We believe everyone concerned will admit that the places of business operated by the dealers, in which tires, tubes and other merchandise are sold at retail, are stores within the definition and meaning of the statute.

In the case of State Board of Tax Commissioners v. Jackson, 283 U.S. 527, 75 L. Ed. 1248, in which the constitutionality of the Indiana chain store tax law was upheld, the Supreme Court of the United States pointed out the ear-marks of chain stores, as follows:

"These consist in quantity buying, which involves the application of the mass process to distribution, comparable to the mass method used in production; buying for cash and obtaining the advantage of a cash discount; skill in buying, so as not to overbuy, and at the same time keep the stores stocked with products suitable in size, style and quality for the neighborhood customers who patronize them; warehousing of goods and distributing from a single warehouse to numerous stores; abundant supply of capital, whereby advantage may be taken of opportunities for establishment of new units; a pricing and sales policy different from that of the individual store, involving slightly lower prices; a greater turn-over, and constant analysis of the turn-over to ascertain relative pfofits on varying items; unified, and therefore cheaper and

better advertising for the entire chain in a given local-
ity; standard forms of display for the promotion of sales;
superior management and method; concentration of manage-
ment in the special lines of goods handled by the chain;
special accounting methods; standardization of store manage-
ment, sales policies and goods sold.

"The appellants' evidence indicated that all of these
advantages are interrelated and interdependent in the chain
store business. . ."

In the case of Fox v. Standard Oil Company, 294 U.S. 87, 79 L. Ed.
780, the Supreme Court of the United States, speaking through
Justice Cardozo, upheld the constitutionality of the West Virginia
chain store tax law and said:

"The opinion in Jackson's case enumerates some of
the advantages of chain store operation, and finds a
sufficient basis for taxing chains differently from stores
separately owned. . .

"We have here abundant capital; standardization in
equipment and display; superior management; more rapid
turnover; uniformity in store management; special account-
ing methods; and a unified sales policy coordinating the
diverse units."

Those features come into existence as a natural result of a central
control of a group of stores. They are the outgrowth of unified
control. Where those ear-marks are found you may expect to find a
central control. We have a situation in the case under considera-
tion in which those features can very easily be brought into exist-
ence, if they are not already in existence.

A reading of the contract shows that Firestone Tire and
Rubber Company controls the dealers in question. It says: "Firestone
will . . . select and recommend for hire by dealer a person trained
in salesmanship . . . and competent in Firestone's opinion to conduct
and manage for dealer sales of Firestone products. . . Dealer agrees
to adopt and employ the merchandising methods of such Budget Plan
. . . and agrees to hire . . . the person so recommended by Fire-
stone and place him in charge of the operation of such Budget Plan
and department for dealer in dealer's place of business . . ."
This clearly allows Firestone Tire and Rubber Company to pick a
man and require the dealer to put him in charge and control of the
sale of merchandise. That is just the same as if Firestone Tire
and Rubber Company had put him in charge directly. As we view
it, it makes no difference that this man in charge is theoretically
employed by and working for the dealer, because he has been selected
by Firestone Tire and Rubber Company and his employment depends

on the company's will. His actions are as much under the control of the company as the actions of a toy mechanical jumping-jack are under the control of a child who owns such an interesting toy, with the exception that the child soon tires of his jumping-jack but the company will constantly be on the alert in watching the man in charge of the dealer's business. And when this man in charge of the dealer's business directs the activities affecting the sale of this merchandise, it constitutes Firestone Tire and Rubber Company being in direct control.

As we understand the facts the dealer's business consists primarily of selling tires, tubes and auto supplies at retail; and the contract recites that the "dealer is purchasing and selling to the trade Firestone tires, tubes, batteries and auto supplies and other Firestone products." The Firestone Tire and Rubber Company has such a "control" that it could, and probably does, sell tires, tubes and other products in the dealer's place of business as effectively as if it directly owned the place.

There are no Texas appellate court cases on this question of control in chain store organizations, but there are a few cases in other jurisdictions that shed some light on the subject. In the case of Gulf Refining Company v. Fox, 11 Fed. Supp. 425, the court construed the provisions concerning "control" in the West Virginia chain store tax law, which are the same as the Texas chain store tax law, and, after considering the management and lease contracts involved in that case, said:

"It may be conceded that it does not exercise full control over all of the actions of the dealers in a strict legal sense, but its actual control is so effective that little room is left for independent action on their part, while full enjoyment of the advantages inherent in a chain store system on its part is ensured. Adequate control over the operating methods of the dealers and of the retail prices of the goods is secured by the right retained by the company to cancel the license agreement and to put an end to the business relations between the parties: . . It is of little moment to the company whether the legal title to the goods resides in it or passes upon delivery to the dealer; . . ."

We think that that language fits the case under consideration. Other cases that shed some light on this question are Ashland Refining Company v. Fox, 11 Fed. Supp. 431; Midwestern Petroleum Corpora-

tion v. State Board of Tax Commissioners, 206 Ind. 689, 187 N.E. 872; Belk Bros. Company v. Maxwell, 215 N.C. 10, 200 S.E. 915.

We are not unmindful of the fact that there are certain provisions in the nature of exceptions in the Chain Store Tax Law of Texas, one of them providing that the term "store" shall not include "any place of business engaged exclusively in the storing, selling, or distributing of petroleum products and servicing of motor vehicles"; but we are assuming that the parties concerned are not limiting their trade in such a manner so as to come within that exception.

Our answer to your question is that Firestone Tire and Rubber Company is liable under the law for a chain store tax on places of business operating under the "Firestone Budget Plan Agreement" contract described above.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By

Cecil C. Rotsch
Assistant

CCR:N

APPROVED JUL 14, 1939

G. W. F. Moore

FIRST ASSISTANT
ATTORNEY GENERAL

APPROVED
Opinion Committee
By WRK, Chairman